CASE NO. 06-15-00122-CR

IN THE
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/7/2015 9:17:00 AM
DEBBIE AUTREY
Clerk

DAVID SYLVESTER CHAMBERS
Appellant

VS.

THE STATE OF TEXAS

_____

ON APPEAL FROM THE 272nd DISTRICT COURT
BRAZOS COUNTY, TEXAS
CAUSE NO. 13-02053-CRF-272

_____

STATE'S  BRIEF

_____

JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

Maritza Sifuentez
Assistant District Attorney
State Bar No. 24082121

300 E. 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
(979) 361-4368 (Facsimile)
msifuentez@brazoscountytx.gov

# IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                          David Chambers

Trial Counsel:                      Shannon Flanigan
                                    P.O. Box 482
                                    Bryan, Texas 77806

Appellate Counsel:                  Richard Wetzel
                                    1411 West Ave Suite 100
                                    Austin, TX 78701

THE STATE OF TEXAS:                 Jarvis Parsons
                                    District Attorney
                                    300 E. 26th Street, Suite 310
                                    Bryan, Texas 77803

Trial Counsel:                      Jennifer Hebert
                                    James Andrew Rogers
                                    Assistant District Attorneys

Appellate Counsel:                  Maritza Sifuentez
                                    Assistant District Attorney

TRIAL COURT:                        Hon. Travis Bryan
                                    272nd District Court
                                    Brazos County, Texas

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................ i

TABLE OF CONTENTS ..................................................................................... ii

INDEX OF AUTHORITIES ............................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ................................................. 1

STATEMENT OF THE CASE .............................................................................. 2

STATEMENT OF FACTS ............................................................................... 2-33

SUMMARY OF THE ARGUMENT ............................................................... 33-35

STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR ONE ................. 35

> **The trial court committed no error when it permitted the State to
> amend Appellant's indictment after the jury was sworn in
> because the State amended an enhancement paragraph-not the
> language of the charged offense, and the State already provided
> sufficient notice of the prior conviction used for enhancement.**

STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR TWO ………........ 47

> **The trial court committed no error when it denied Appellant's
> Motion to Suppress Evidence, where he alleged there was no
> corroboration of the witnesses tip. The record shows that: (1) law
> enforcement corroborated the witnesses observations and (2) the
> witnesses provided an inherently reliable tip.**

STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR THREE ……….. 60

> **Appellant's judgment of conviction incorrectly reflects the degree
> of offense as a second-degree felony instead of a state-jail felony;
> the judgment should be reformed.**

PRAYER .......................................................................................................... 63

CERTIFICATE OF SERVICE...................................................................................... 63

CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4 ..........................64

iii

# INDEX OF AUTHORITIES

## STATUTES

TEX. CODE CRIM PROC. § art. 28.10(b) ...........................................33, 35, 36, 41, 42

TEX. R. APP. P. 44.2(b)...............................................................................................45

TEX. PENAL CODE § 31.04(e)(4)(a) .......................................................................60, 61

TEX. PENAL CODE §12.425(b) .......................................................................................61

## CASES

*Barnes v. State*, no. 14-05-00144-CR, 2006 WL 2548186 (Tex. App.—Houston [14th Dist.] Sept. 5, 2006, pet. ref'd) (not designated for publication) ..................................................................................................40, 42, 44, 45, 46

*Brother v. State*, 85 S.W.3d 377 (Tex. App.—Fort Worth, 2002, pet. ref'd) ..................................................................................................48, 53, 57-58

*Brooks v. State*, 957 S.W.2d 30 (Tex. Crim. App. 1997) .......................................38

*Bryant v. State*, no. 14-99-01373-CR, 2002 WL 27573 (Tex. App.—Houston [14th Dist.] Jan. 10, 2002, pet. ref'd) (not designated for publication.)......41, 45, 46

*Derichsweiler v. State*, 348 S.W.3d 906 (Tex. Crim. App. 2011) ............52-53, 55-57

*Ford v. State*, 334 S.W.3d 230 (Tex. Crim. App. 2011) .............................60, 61

*King v. State*, 935 S.W.2d 266 (Tex. Crim. App. 1997) .........................................45

*Martinez v. State*, 261 S.W.3d 773 *(*Tex. App.—Amarillo 2008, pet. ref'd.) ..................................................................................................57, 60

*Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002) .............................45, 45

*Mount v. State*, 217 S.W.3d 716 (Tex. Crim. App. 2007.............................47, 53

*Newton v. State*, 301 S.W.3d 315 (Tex. App. —Waco, 2009, pet. ref'd) ..................47

*Romo v. State,* no. 10-14-00036-CR, 2014 WL 6609050 (Tex. App.—Waco Nov. 20, 2014, no pet.) ......................................................................................................61-62

*Sample v. State*, 405 S.W.3d 295 (Tex. App.—Fort Worth 2013, pet. ref'd)............43

CASE NO. CASE NO. 06-15-00122-CR

IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS

_____

DAVID SYLVESTER CHAMBERS
Appellant

VS.

THE STATE OF TEXAS

_____

ON APPEAL FROM THE 272nd DISTRICT COURT
BRAZOS COUNTY, TEXAS
CAUSE NO. 13-02053-CRF-272

_____

STATE'S  BRIEF

_____

TO THE HONORABLE COURT OF APPEALS:

COMES NOW, the State of Texas, by and through its District Attorney, and files this brief in response to the points of error alleged by Appellant, and would respectfully show the Court the following:

**<u>STATEMENT REGARDING ORAL ARGUMENT</u>**

Appellant did not request oral argument. The State, likewise, does not request oral argument.

## STATEMENT OF THE CASE

Appellant, David Silvester Chambers, was charged by indictment with the state jail felony offense: Theft of Property $1,500-$20,000 enhanced by punishment to a second degree felony.[1] (CR 5). On April 6, 2015, Appellant pled "Not Guilty" to the jury for the offense of Theft of Property $1,500-$20,000. (6 RR 185). The jury found Appellant guilty of Theft of Property $1,500-$20,000 as charged in the indictment. (CR 32; 7 RR 88). Appellant elected for the trial court to assess punishment. (CR 17). Appellant also pled "Not True" to the enhancement paragraphs. (CR 35; 8 RR 7). The trial court found both enhancement paragraphs true, and assessed punishment at 15 years in the institutional division of the Texas Department of Criminal Justice. (CR 36; 8 RR 84). Notice of Appeal was filed on June 12, 2015. (CR 51).

## STATEMENT OF FACTS

*Pre-trial suppression hearing*

**Officer James Hauke** (Bryan Police Department), a nineteen-year law enforcement veteran, was assigned to the Canine (K9) Unit that supports patrol. (6 RR 155-56, 165). On March 9, 2013 at around 12:50 a.m., Hauke responded to a 911 dispatch indicating that witnesses were in their vehicle and following a

---

[1] Appellant's state jail felony was enhanced to a second degree felony by two prior felony convictions: (1) Cause No. 35042, in the 212th District Court of Galveston County, Texas for the felony offense of Burglary of Habitation on August 4, 1978; and (2) Cause No. 807868, in the 228th District Court of Harris County, Texas for the felony offense of Unlawful Possession of a Firearm by a Felon on August 25, 1999. (CR 5).

reckless driver who was in possession of a trailer that was possibly stolen. (6 RR 156, 160-61); *See* State's Pre-trial Exhibit 2: CAD notes from 911 dispatch. 911 dispatch and the CAD computer system apprised Hauke of the witnesses' ongoing locations and that the suspect was trying to escape by driving recklessly down streets and the highway. (6 RR 156, 157, 159, 160-61); *See* State's Pre-trial Exhibit 2: CAD notes from 911 dispatch. 911 dispatch informed officers that the witnesses described their vehicle as the maroon Dodge Charger, and the suspect was driving a black dually pickup with the white cargo trailer attached. (6 RR 160-61).

While the witnesses relayed information, 911 dispatch then relayed the witnesses' information to law enforcement using the CAD computer system and "live" broadcast. (6 RR 157-58, 166-67). Hauke stated that he received the CAD notes, the 911 call, and dash-cam video from his patrol vehicle. (6 RR 157-59). The state's exhibits were admitted. (6 RR 159). The CAD notes reflected the information that 911 dispatch relayed to Officer Hauke. (6 RR 157).

Hauke used the information relayed from dispatch to locate the witness's maroon Dodge Charger on the highway. (6 RR 161-162). Officer Hauke began pursuing the suspect around the time the suspect was leaving the city of Bryan and entering the city of College Station. (6 RR 161). Hauke testified that his dash-cam-video showed the witness's maroon Charger that was following the

3

suspect's black dually truck with the cargo trailer attached. (6 RR 164). Hauke caught up with the witness's maroon Dodge Charger, passed the Charger, and then drove in behind the suspect with the stolen cargo trailer. (6 RR 159,161). Appellant exited Highway 6 at the Barron Road exit in College Station. (6 RR 161, 172). Officer Hauke followed. (6 RR 161). Hauke tried to read the paper license tag on the stolen trailer while he followed Appellant. (6 RR 167). All Hauke could make out was "delta, one, three" (D13), so he was not able to request that 911 dispatch determine the registered owner of the cargo trailer before he stopped the dually truck. (6 RR 167-68). Hauke also could not see the license plate on the dually truck. (6 RR 168).

Hauke waited for a College Station Police unit to arrive as backup before initiating his stop on Appellant's vehicle. (6 RR 161). Felony-stops are usually carried out using two officers since the suspects could be armed and dangerous. (6 RR 168-69). When Hauke made the traffic stop, Appellant decided to exit his vehicle. (6 RR 162,173). Hauke identified Appellant, in court, as the person that was driving the black dually truck and was pulling the stolen cargo trailer. (6 RR 161, 162). At that point, Hauke instructed Appellant to "turn and walk backwards towards me." (6 RR 162). Appellant also reached for his pocket, though Hauke already asked him to put his hands on the cab, which concerned Hauk. (6 RR 173). Hauke never drew his weapon on Appellant. (6 RR 173). A College Station

officer then took Appellant and placed him in the back of a patrol car while 911 Dispatch determine who was the registered owner of the trailer. (6 RR 162-63). The owner was Nathan Kleinman with Woodbolt Industries located in downtown Bryan. (6 RR 163).

Officer Hauke admitted that he did not personally observe Appellant's reckless driving. (6 RR 174). Hauke testified that his reasonable suspicion for stopping Appellant was based on the information regarding the offense in Bryan and what the witnesses reported to dispatch. (6 RR 172,175). Hauke had witnesses that were feeding 911 dispatch information. (6 RR 171-172). Dispatch then relayed that information to the officers. (6 RR 166). Hauke listened to the 911 dispatcher: "live. I was there live when it happened…[y]es, I did not hear the caller. I heard the dispatcher, what they were telling me." (6 RR 166).

When Hauke heard that Appellant was driving in a crazy manner away from witnesses who were following him, Hauke suspected that it was because Appellant was attempting to "get away" with stolen property. (6 RR 160). Hauke also believed that crimes occur more frequently after midnight so that suspects can use the cover of darkness as a shield. (6 RR 160). Hauke testified that: "my suspicion was it's basically one o'clock in the morning. He's [Appellant] the only black dually and white trailer with a witness following behind him." (6 RR 175).

Before initiating the stop, Hauke verified that there was a Charger following behind Appellant. (6 RR 175). After the traffic stop, Hauke also spoke to the witnesses who made the 911 call. (6 RR 163, 177). The witnesses were waiting on stand-by at a nearby Harley Davidson parking lot. (6 RR 163, 177). The witnesses gave Hauke several forms of identifying information: driver's licenses, names, and "anything [Officer Hauke] could think to ask for." (6 RR 163-164). The witnesses also provided written statements. (6 RR 164).

On cross-examination, Hauke stated that, had the witnesses' 911 report been a false report, prank, or that somebody had tricked Appellant into taking a trailer that did not belong to him, Hauke would have to investigate first in order to make that determination. (6 RR 177).

Officer Hauke authenticated the audio of the 911 call from the reporting witnesses, and it was admitted as State's Pre-Trial Exhibit No. 3. (6 RR 158); *see* State's Pre-trial Exhibit No. 3: *Audio of 911 Call*. State's Pre-Trial Exhibit No. 3 was played in its entirety, in open court (6 RR 164); the following is a transcription of State's Pre-Trial Exhibit No. 3:

911 OPERATOR: 911 what's the address of the emergency

WITNESS 1: Uh, we're just following somebody that's uh that's uh has a stolen trailer, we believe

911 OPERATOR: that you believe has a stolen trailer?

6

WITNESS 1: yeah, they stole it off of uh

WITNESS 2: they are over here by East Park

WITNESS 1: they're over here by East Park

911 OPERATOR: Okay, who's trailer is it?

WITNESS 2: it's called Manning Way

WITNESS 1: It's called Manning Way

911 OPERATOR: okay, Manning Way and what's the other street

WITNESS 1: What's that other street?

WITNESS 2: Over here by East Park

MALE WITNESS: Over here by East Park

WITNESS 2: We went the other direction because they know we are following them...I turned around know we are following them

WITNESS 1: We went the other direction they know we are following us..they know we are following them.
**[Time Stamp: 00:00:39]**

911 OPERATOR: Okay, what's, I need an intersection that you guys are at?

WITNESS 2: Moss and Manning

WITNESS 1: We are at Moss and Manning

WITNESS 2: they got to come back out this way towards us

911 OPERATOR: Okay, why do yall think it was stolen?
**[Time Stamp: 00:00:50]**

WITNESS 2: We were sitting here in the yard

7

WITNESS 1: We were sitting in the yard…I'm turning around….and we were just sitting in the yard and we saw them hook it up to the trailer

WITNESS 2: And they looked suspicious

WITNESS 1: they looked suspicious, and its 12 o'clock, almost was one o'clock at night, and

WITNESS 2: the way they drove          **[Time Stamp: 00:01:06]**

WITNESS 1: the way they drove, they're driving real crazy

WITNESS 2: hitting curves

WITNESS 1: hitting curves and everything

911 OPERATOR: Okay, where are, where is it at now?
                              **[Time Stamp: 00:01:12]**

WITNESS 2: They turned off of uh Manning up into East Park but there's only one way out and they haven't came back out yet

WITNESS 1: They haven't came back out yet, we're at Moss

WITNESS 2: and Manning Way

911 OPERATOR: is East Park a mobile home park? Or what is that?

WITNESS 2: No that's Eastside Park off MLK

WITNESS 1: that's Eastside Park by MLK, MLK

WITNESS 2: pull over to the right

WITNESS 1: Oh there they are

WITNESS 2: they are unhooking it

8

911 OPERATOR: hold on real quick, hold on for me

WITNESS 2: They are trying to turn it around now

WITNESS 1: They just saw me…

WITNESS 2:…stop its okay….

WITNESS 1: they saw me.

WITNESS 2: it's okay that they saw you

WITNESS 1: I'm gonna pull over to the side of the road

WITNESS 2: You gotta make sure you can see them

WITNESS 1: I see them..I see the trailer     **[Time Stamp: 00:01:56]**

WITNESS 2: they're on Manning Way

911 OPERATOR: okay, hold on for me

WITNESS 2: they turned it around, they're leaving again

WITNESS 1: ugh oh here they come

WITNESS 2: okay, stop backing up

WITNESS 1: why?

911 OPERATOR: (speaking to someone else)

WITNESS 2: they are getting back on MLK

WITNESS 1: they're getting back on MLK

911 OPERATOR: Now they're on MLK?

WITNESS 1: yes

WITNESS 2: We are gonna see which way they go

WITNESS 1: We are gonna see which way they go

911 OPERATOR: What kind of vehicle is it?

WITNESS 1: It's a Dodge dually, um a Chevrolet dually

911 OPERATOR: Is the trailer still hooked up?

WITNESS 1: Yeah trailer is still hooked up, he got it, he still gots it

WITNESS 2: They haven't turned on MLK yet

WITNESS 1: They haven't turned MLK, they're still on uh Dumas

WITNESS 2: Douglass

WITNESS 1: Douglass, no- D-U-M-A-S-S

911 OPERATOR: okay, hold on for me

WITNESS 1: Dumas and MLK, they're turning

WITNESS 2: they're going again

WITNESS 1: they're going again

911 OPERATOR: they are going where?

WITNESS 1: they are going, hold on. Hold on. They're just, they're staying still.

911 OPERATOR: at the entrance to MLK?

WITNESS 2: they're going left down uh MLK, they're going back to the highway 6, back to highway 6

WITNESS 1: turn right to see which they are going

WITNESS 2: they are going back to highway 6

911 OPERATOR: towards highway 6?

WITNESS 2: yes

WITNESS 1: yes, to highway 6, MLK to highway 6 right now

911 OPERATOR: okay, are they over the bridge or what?

WITNESS 1: yep they are about to hit the bridge, they're at the stoplight, they're at the stoplight

911 OPERATOR: they are at the bridge?

WITNESS 1: yeah they're at the bridge right now

WITNESS 2: we are trying to keep

WITNESS 1: we are trying to see if they're going straight or turn

911 OPERATOR: okay, what kind of vehicle did you say? What color dually?

WITNESS 1: it's a black dually- they are sitting at the red light right now, oh they are turning right, they're turning right
                                    **[Time          Stamp: 00:03:35]**

WITNESS 1: They're turning right. They are going towards the old DPS office. I'm trying to get back up to them right now**. I'm in the red Dodge charger, so if they see me uh speeding-**

911 OPERATOR: **okay, are they are on the feeder, or are they on the highway?**

**WITNESS 1: they are on the feeder road right now**

**WITNESS 2: coming to the exit**

11

**WITNESS 1: We are trying to see if they are exiting off**

**911 OPERATOR: Now they are on the feeder road in front of the DPS office, old DPS office?**

**WITNESS 1: uh yeah.**

**WITNESS 2: No, they got on the highway**

**WITNESS 1: No, they got on the highway**

**911 OPERATOR: On the freeway? On the freeway?**

**WITNESS 1: They're on the highway. They're on Highway 6 in front of the old DPS office, um, they're headed towards, um College Station right now. They've got the white boxed-in trailer with black Chevrolet dually truck        [Time        Stamp: 00:04:30]**

WITNESS 2: it's four door

WITNESS 1: it looks four door, but we really can't make sure

911 OPERATOR: okay, can you give me a LP on that truck, or yall not close enough?                                **[Time        Stamp: 00:04:38]**

WITNESS 1: uh, we have the….whats the

WITNESS 2: the trailer vin number was like 813666H- I believe

WITNESS 1: yeah

911 OPERATOR: that's the VIN number?

WITNESS 2: no, that's the license plate number on the trailer

WITNESS 1: on the trailer                **[Time Stamp: 00:04:51]**

911 OPERATOR: okay, where is the vehicle at now?

WITNESS 1: okay, we are going underneath um, William Joel Bryan, the bridge on Highway 6

WITNESS 2: okay, we're off the…they just did a u-turn off Manning Way back over the bridge

WITNESS 1: they tried to loose us

911 OPERATOR: okay, well where

WITNESS 1: yeah they are, they are going faster now

911 OPERATOR: stay on the phone with me. Are they heading into College Station?

**WITNESS 1: Yes. Heading into College Station right now. Um, I don't know if they are going to exit Briarcrest or not. I'm about to see. We're about to hit Briarcrest.**

WITNESS 2: they are staying on the bypass

WITNESS 1: they are staying on the bypass

**911 OPERATOR: We got a stolen trailer heading to another town. Okay, are yall still on the highway?**

**WITNESS 1: yeah, we're still on the highway**

911 OPERATOR: what intersection yall coming up to?

WITNESS 1: uh, we are going underneath the bridge of uh, no that's not University..Briarcrest, Briarcrest

911 OPERATOR: passing Briacrest?

WITNESS 1: yeah, yeah passing Briarcrest right now, going underneath the bridge…and like the trailer lights are flickering on and off so you'll be able to see it. Alright, we are passing Lowe's

**[Time Stamp 00:06:03]**

13

911 OPERATOR: passing Lowe's right now?

WITNESS 1: We're passing Lowe's we are still on the highway
**[Time Stamp 6:15]**

WITNESS 2: they did a u-turn on….

WITNESS 1: We're passing the Dodge dealership on highway 6 and

911 OPERATOR: okay, yall still on 6?

WITNESS 1: yep, still on 6. Passing Dodge, passing the Furniture Row….I don't see no cops here

WITNESS 2: they hit a curb

WITNESS 1: they hit a curb and everything driving crazy
**[Time Stamp: 00:06:54]**

911 OPERATOR: okay, just let me know when they exit, if they do

WITNESS 1: okay.

911 OPERATOR: what are yall gonna be in?

WITNESS 1: uh, **I'm in a maroon Dodge Charger, 07 Dodge Charger, tinted windows.** Alright still going straight it did not exit, did not exit University, going underneath University bridge on highway 6 **[Time Stamp: 7:08]**

911 OPERATOR: hey is it a closed-in trailer or a, what kind of trailer is it?

WITNESS 1: **closed-in trailer, box trailer**

WITNESS 2: box trailer

911 OPERATOR: a box trailer

14

WITNESS 1: **all white**

911 OPERATOR: all white

WITNESS 1: all white, boxed-in trailer

911 OPERATOR: okay, alright just,

WITNESS 1: they're still going

911 OPERATOR: Yeah, where yall at now, sir?

WITNESS 1: Um, we're passing Scott and White

911 OPERATOR: Passing Scott and White?

WITNESS 1: Yeah.

WITNESS 2: coming up on Harvey

WITNESS 1: coming up on Harvey          **[Time Stamp: 00:07:59]**

911 OPERATOR: Tell me, let me know if they exit Harvey

WITNESS 1: alright….looks like they are staying on….they are starting to slow down they see us

911 OPERATOR: I don't want yall to put yall's selves in harm's way, alright?

WITNESS 1: nah, I'm not, I'm I'm trying not to

911 OPERATOR: I don't want you to stay up right behind them, they slam the breaks and yall have to hit the back of them

WITNESS 1: yeah I'm staying way away from them now**. I think they see us.** Alright we are going over the bridge of uh Harvey Road

911 OPERATOR: They're still on 6 past Harvey

WITNESS 1: **we're coming up on Southwest Parkway exit, and we don't know if they're gonna exit yet**

WITNESS 2: **They're swerving a little bit**

WITNESS 1: they're swerving. Man I gotta pee.

911 OPERATOR: we're trying to get the whole force out there right now. **[Time Stamp: 00:09:00]**

WITNESS 1: alright, alright we are going underneath the uh Southwest Parkway bridge right now, bout to. They're slowing down.

WITNESS 2: **They know they're being followed now**

WITNESS 1: **They know they're being followed**

WITNESS 2: I hope we're not trippin'. We're passing underneath uh Southwest Parkway bridge

WITNESS 1: **you know its stolen, cause they're driving crazy**
**[Time Stamp: 00:09:24]**

911 OPERATOR: **I think we had the owner call in, and call and tell us it was stolen also** **[Time Stamp: 00:09:26]**

WITNESS 1: Really? Huh. That's crazy

911 OPERATOR: **just keep me updated. Yall are still on Highway 6?**

WITNESS 1: yeah still on Highway 6, we're passing Central Park, the Beachy Park

911 OPERATOR: let me know if they take Emerald Forest

WITNESS 1: alright

WITNESS 2: They already called and said it was stolen?

16

WITNESS 1: Yeah, they already called and said it was stolen.

WITNESS 2: we were watching them

WITNESS 1: **We were watching, we watched them hook up to the trailer and everything**

911 OPERATOR: **okay, can I get your name sir?**
**[Time Stamp:00:10:13]**

WITNESS 1: **Mario.** No they're not going on Emerald Parkway, they're keep going straight. They're heading towards Navasota. Uh, **Mario Thompson.**                **[Time Stamp: 00:10:15]**

911 OPERATOR: Hold on real quick, hold on.

WITNESS 1: Man, I gotta pee like a racehorse.

911 OPERATOR: Okay, **Mario, what's your last name?**

WITNESS 1: **Thompson. T-H-O-M-P-S-O-N**

911 OPERATOR: **And, a call back number?**

WITNESS 1: **979-676-3969.** They did not exit the Texas and Deacon exit they keep going straight        **[Time Stamp: 00:10:48]**

911 OPERATOR: okay

WITNESS 1: they're at Rock Prairie exit

911 OPERATOR: Are they taking?

WITNESS 1: no, uh, no. They're not taking Rock Prairie. They're not taking Rock Prairie. Uh, here comes a cop, I believe. He's coming up pretty fast

911 OPERATOR: **can you put your flashers on and let him know**
**[Time Stamp: 00:11:08]**

17

WITNESS 2: they got him

WITNESS 1: ught oh. Canine unit. Canine unit.

911 OPERATOR: **put your flashers on**

WITNESS 1: nah, he came up he's behind the trailer right now

WITNESS 2: he uh

WITNESS 1: it flew up on him

WITNESS 2: he goes like

911 OPERATOR: okay

WITNESS 1: he's in the Expedition

WITNESS 2: still on Highway 6

911 OPERATOR: okay. yeah that's gonna be uh, gonna be, it's a K-9 unit, but

WITNESS 1: **want my flasher's on? Do I need to keep my flashers on?**

911 OPERATOR: yeah, you can go ahead and back off a little bit from the officer

WITNESS 1: okay

911 OPERATOR: the officers on him right now

WITNESS 1: **okay, I was just wondering if they need anything from us, I don't want them to see us though**

911 OPERATOR: Well, I'm going to uh,

WITNESS 1: they're coming up on Barron Road

911 OPERATOR: **okay, is it okay if the officer contacts you?**

WITNESS 1: **yeah.**

911 OPERATOR: **okay, I'll let him know that he can contact you, alright?**

WITNESS 1: **We live right there where it was stolen at, right there at that, across the street**

911 OPERATOR: **Do you still have your flashers on?**

WITNESS 1: **yes. I have my flashers on**.

WITNESS 2: they're exiting, they're turning

WITNESS 1: oh they're turning, they're turning

WITNESS 2: They're pulling them over now, they turned on their lights

WITNESS 1: Now, they're pulling them over

911 OPERATOR: yeah, they got them and pulled them over. Okay, hold on real quick for me

WITNESS 1: okay

WITNESS 2: we're right here on…

911 OPERATOR: hey (inaudible) do they need to pull over on the shoulder?

911 OPERATOR: is it okay if you guys can pull over to the side of the road on the shoulder, a little bit behind the K-9 unit, not directly behind them but about 100 feet or so

WITNESS 1: **uh, I'm over here at this uh the cleaner's I passed the street up where they were**

911 OPERATOR: you passed them up?

[Time Stamp: 00:12:52]

WITNESS 1: yeah, I'm uh on the feeder road

911 OPERATOR: okay, are you in front of them then?

WITNESS 1: no, I'm uh, they went down uh what is it Dartmouth? Not Dartmouth, but uh

911 OPERATOR: **is there anyway you can get back over there?**
[Time Stamp: 00:13:03]

WITNESS 2: yeah, we can go back around

WITNESS 1: **yeah, I can turn around but, alright**

911 OPERATOR: okay, they're

WITNESS 1: I'm on the feeder road

911 OPERATOR: they're at Barron and Highway 6

WITNESS 2: They're right behind, next to the Dexter Insurance Building

WITNESS 1: Dexter Insurance Building

WITNESS 2: And, American Mo- Bank or whatever it is

WITNESS 1: The insurance building

911 OPERATOR: Are they right there before the

WITNESS 1: yeah, they're right there by the insurance building

911 OPERATOR: Chevron, is the Chevron right there?

WITNESS 2: No, there's like a

20

WITNESS 1: No, no there's, that's uh

WITNESS 2: American Momentum Bank

WITNESS 1: where this bank is

911 OPERATOR: So, they're on Graham Road?

WITNESS 1: Graham Road, Graham Road yeah. I passed up Graham Road already

911 OPERATOR: okay, they're on Graham, Arby's, okay

**[Time Stamp: 00:13:51]**

WITNESS 1: I got it

911 OPERATOR: okay, is there a way you can uh pull back around?

WITNESS 1: yes

WITNESS 2: We're just gonna go under the bridge thing and come back

WITNESS 1: Alright, Ima come back around, okay?

911 OPERATOR: okay, uh um how did you take the bridge, the turn around?

WITNESS 1: yeah Ima go back to the turnaround

911 OPERATOR: okay. That's fine yeah just go and um

WITNESS 1: I don't want them to see me

911 OPERATOR: you don't have to get out of the car

WITNESS 1: Alright.

911 OPERATOR: Well, here hold on real quick, hold on for me

21

WITNESS 1: okay, I already turned

WITNESS 2: I don't recog- I don't know the truck

911 OPERATOR: yes, they are turning back around, they passed up the officers and they are turning back around. Okay, we are gonna ask the officer, okay, if he needs you to stand by alright? Alright?

WITNESS 1: Alright.

911 OPERATOR: So, just kinda hang on for me real quick

WITNESS 1: Alright.

911 OPERATOR: if you need to, pull off like to the shoulder or something

WITNESS 2: and I seen the way he was moving and he looked and he looked suspicious, you know what I'm saying? [Time Stamp:15:24]

911 OPERATOR: yeah, yeah he stole it

WITNESS 2: I was leaning on the end of the car and I noticed there was somebody over there messing with all that, it sure was late for somebody to be messing with that stuff. That was just odd, you know what I'm saying?

911 OPERATOR: hold on for me

WITNESS 1: **Alright, I'm over here at the Harley Davidson shop they want me to loop back around them**

911 OPERATOR: You're by the Harley Davidson?

WITNESS 1: yeah, Harley Davidson shop

911 OPERATOR: Okay. Are you pulled into the parking lot?

WITNESS 1: uh yeah, I'm pulling into the parking lot right now

911 OPERATOR: okay

WITNESS 1: Is he out too? I guess they didn't want me to see him

911 OPERATOR: hold on, that might be an okay place to just stay there and the officer can just meet you over there

WITNESS 1: Alright, that's cool

911 OPERATOR: Let me just check real quick

WITNESS 1: okay

911 OPERATOR: He's in the Harley Davidson parking lot

WITNESS 1: I'm not…nah, the cops already know I'm over here…(indistinguishable)...motion sensor…(indistinguishable)

911 OPERATOR: Yeah just sit tight for me right quick, alright?

WITNESS 1: Alright

911 OPERATOR: The officers are trying to get everything figured out.

WITNESS 1: there goes another one…man I wish I was on patrol, oh there goes the sheriff

WITNESS 2: they're ready to get his ass

WITNESS 1: man, sheriff coming, College Station, what's this one?

WITNESS 2: I'm the one that noticed it, I was the one watching them

WITNESS 1: I know

WITNESS 2: I'm just leaning on the hood of the car talking, and then I'm like, you see that?

WITNESS 1: You were like, "Mario get in the car." I can't believe someone gonna steal a trailer at 12 o'clock at night, one o'clock

911 OPERATOR**: is that right there where yall live?**

WITNESS 1: yeah

WITNESS 2: I live there

WITNESS 1: **yeah she lives there**

911 OPERATOR: **yall know who the owner is of that trailer, or no?**

WITNESS 1: **uh, we think it's like the weight lifting**
                                              **[Time Stamp: 00:18:12]**
WITNESS 2: the power lifting

WITNESS 1: Like power lifting and exercising, and stuff like that

WITNESS 2: they're there every day exercising

WITNESS 1: **So, they know that something is inside that trailer**

911 OPERATOR: yeah, bunch of probably weights and stuff that cost a lot of money

WITNESS 1:  yeah, yes

WITNESS 1: Ima go trade my car in now

WITNESS 2: *yeah*

911 OPERATOR: just wait right there, I can get off the phone with them. Okay, sir?

WITNESS 1: yes

911 OPERATOR: **Ima go ahead and get off the phone with you, but if you guys can just sit tight in that parking lot, we are gonna have the officer come over to you guys, alright**?

WITNESS 1: Alright

911 OPERATOR: And, if anything changes I'll give you a call

WITNESS 1: Alright

911 OPERATOR: Alright?

WITNESS 1: Alright

911 OPERATOR: Alright, bye.

WITNESS 1: Bye.

*See* (9 RR State's Pre-Trial Exhibit No. 3: *Audio of 911 call* from 00:00:00 to 000:19:17).

### *State's evidence during guilt-innocence phase*

**Officer James Hauke** (the detaining officer), testified that he was a certified peace officer for over 19 years with thousands of hours of training. (6 RR 189-90). On March 9, 2013 around 12:45 a.m., 911 dispatch reported a "call-in-progress." (6 RR 190). A call-in-progress provides law enforcement with what is currently occurring. (6 RR 190). The call was for a reckless driver who was traveling through neighborhoods suspiciously. (6 RR 191).

Witnesses reported that they were following the driver they believed had stolen a trailer. (6 RR 191). Dispatch provided the witnesses' descriptions of the

suspects vehicles. (6 RR 191). The suspect vehicle was described as a "black dually pulling a white cargo trailer." (6 RR 191). The reporting witnesses' vehicle was a maroon Dodge Charger. (6 RR 191). Hauke located both vehicles as they were traveling on the highway in South College Station. (6 RR 192). He "observed a maroon Charger following a pickup with a cargo trailer attached to it." (6 RR 192). Hauke specifically identified Appellant's black truck as the witnesses reported it. (6 RR 192). After Hauke identified the truck with the cargo trailer, Appellant exited the highway, and Hauke followed behind him. (3 RR 192). Hauke then initiated a traffic stop at Graham Road and Barron Road. (6 RR 192).

Hauke's dash-cam recorded the pursuit of the stolen trailer and Appellant's traffic stop. (6 RR 193). Hauke explained that State's exhibit 2 was a screenshot from his dash-cam video showing the hood of his patrol unit, the black dually truck, and the cargo trailer he suspected had been stolen. (6 RR 194-95). The video also showed Appellant getting out of the black dually. (6 RR 195). Hauke also explained that the footage showed him following behind the white cargo trailer. (6 RR 197).

Once Appellant was detained, Hauke confirmed that Appellant was not the owner of the cargo trailer, and Appellant did not have the keys to open the cargo trailer. (6 RR 163, 197-98). Hauke also spoke to the two witnesses that reported

26

Appellant to 911 dispatch, and both of them provided their names: Carla Pillow and Mario Thompson. (6 RR 198-99).

**On cross-examination,** Hauke agreed that he should make sure he has the best evidence before stopping people and accusing them of a crime, and it was also important for Hauke to verify information he received before he stops someone for committing a crime. (6 RR 199-201). Hauke agreed that he did not make any contact with whom he believed had stolen the trailer. (6 RR 201). Hauke admitted that all of his information was based on information exchanged between witness-to- dispatch- to-officer. (6 RR 201). Hauke only spoke directly to the witnesses, later. (6 RR 202).

Hauke agreed that he didn't' know very many details, and he just had the identification of who somebody Hauke did not know that was accusing somebody else of stealing a trailer. (6 RR 202). However, Hauke stated that he did verify a white trailer was being pulled by a black dually. (6 RR 202). Hauke agreed that he could not see the license plate numbers, so he started a felony stop before Hauke had all the facts, and that getting that license plate is pretty important to an investigation of the stolen trailer. (6 RR 204).

Hauke testified that dispatch informed him that somebody hooked up a trailer and drove away with it. (6 RR 205). Hauke knew the reporting persons were witnesses from across the street. (6 RR 206). Hauke also admitted that "the

27

stop happened before [Hauke] [was] able to verify some critical information." (6 RR 206). However, Hauke testified that he could only initiate an investigation into the truth of the reporting witnesses' report after first making a traffic stop. (6 RR 296).

Further, Hauke stated that dispatchers were "continuously" getting information "straight from the witnesses who were following the suspects," and then 911 dispatch relayed that information to Hauke who "continuously" received updates. (6 RR 207). Hauke believed it was important to stop Appellant because of the "need to stop the theft in progress, and we don't want to jeopardize our witnesses. He's [Appellant] already tried to elude, based on the call, one time from witnesses. So we don't want anything reckless happening." (6 RR 207). The witnesses who were continuously on the phone with 911 dispatch stuck around to talk to officers. (6 RR 207). Hauke stated that he could not make out the license plates number to find out who the owner was, so he had no other way to investigate whether the cargo trailer was stolen unless he stopped Appellant, first. (6 RR 208).

**Mario Thompson** testified that he was the witness who chased Appellant when it appeared that he had stolen someone's trailer and reported Appellant to 911. (7 RR 18, 39). He stated that on March 9, 2013, he was at a barbecue at his friend, Carla Pillow's, house. (7 RR 8-9). Mario had been friends with Carla for

over five years. (7 RR 8). Carla's barbecue lasted "about all night," and Mario did not leave until around one in the morning. (7 RR 9). Carla Pillow lived in Brazos County off of Martin Luther King and Tabor Road. (7 RR 9).

That night, they were standing in Carla's driveway. (7 RR 12). Around 12:30 at night, Mario saw something that caught his attention. (7 RR 12). Across the railroad tracks, he could see someone standing at a building that "exercising people use" after work. (7 RR 12). Mario would visit Carla at night, and "there's usually not nobody over there at that time." (7 RR 12). The area is usually pretty dead. (7 RR 12). There was always a white box trailer at the building. (7 RR 13). Mario believed the trailer was full of workout equipment. (7 RR 13).

That night, Mario saw a black Chevy dually suspiciously next to the trailer. (7 RR 13-14). He could see "lights come on and lights come off," but then he did not see anyone until cars passed by and illuminated the suspect who was in a hiding spot. (7 RR 14). When cars would pass by, and their headlights hit the suspect, the suspect would hide by "just kind of putting their self-up against the trailer between the truck and the trailer." (7 RR 15). But, when the headlights went away, the suspect would continue "going on with their business." (7 RR 15). Mario had never seen anyone over at that building during that hour when he would visit Carla Pillow. (7 RR 15).

It took the suspect about 15-20 minutes to hook up the trailer, and Mario suspected it took so long because the person was "trying to get the lock off." (7 RR 15). Mario saw that the person was messing with the trailer hitch. (7 RR 16). The suspect was there alone. (7 RR 16). After the suspect hooked up the trailer to his truck, he "took off pretty fast" and "jumped the curb" when taking off. (7 RR 18). Mario decided to follow him because "nobody is not supposed to be stealing a trailer." (7 RR 18).

While following the suspect, Mario lost him for a few seconds but then caught back up. (7 RR 20). Mario saw that the suspect stopped and was "fiddling" with the trailer; Mario thought the suspect probably jack-knifed it. (7 RR 21). Mario called 911 and that is when the suspect took off again. (7 RR 21). The suspect only got out of his truck once, and Mario saw him get back into his truck. (7 RR 22). The suspect traveled down a dead-end street, and then turned around to go to Martin Luther King Street, and then headed to Highway 6. (7 RR 22). Mario continued to follow behind the suspect but kept a good distance because he did not want the suspect to see him. (7 RR 23). Mario could tell that the suspect knew he was being followed because the suspect took off fast onto the highway and was driving in between cars. (7 RR 23). One of the reasons Mario believed the suspect had stolen the trailer was because he was "driving crazy." (7 RR 31).

Mario could clearly see the white trailer and big dually pickup truck. (7 RR 35-36). Mario agreed that he could not see the interior of the truck, so there could have possibly been another person inside. (7 RR 36). The suspect also drove the wrong direction down a one-way alley with signs stating, "Do Not Enter." (7 RR 35).

Mario agreed it was possible that the person who got back into the vehicle was a different person. (7 RR 43). Mario was not able to determine the suspect's identity. (7 RR 43). However, Mario testified that he only lost sight of the suspect for a brief period and "got right back to him" "pretty quick." (7 RR 44).

Mario agreed that although he could not say for certain that the exact person that hooked up the trailer was the same person he watched get out of the vehicle on Manning Way street, "there was nobody that came outside of a house or out of another vehicle that was around." (7 RR 46-47).

**Duane Monteilh** testified that he was an employee of Woodbolt Distributors that was doing business as Nutrabolt. (7 RR 49). He was the purchasing agent that bought the white cargo trailer for Woodbolt Distributors. (7 RR 49-50). The trailer cost $4,651.03. (7 RR 52). He bought the trailer on November 27, 2012. (7 RR 53). They stored the trailer on the back alleyway behind the company warehouse. (7 RR 53). The trailer was used to store workout equipment, and it held $10,500.00 worth of workout equipment when it was

31

stolen. (7 RR 53-54). Monteilh verified that the stolen trailer was the same trailer that belonged to his company and held their workout equipment. (7 RR 55). Monteilh also stated that the company's workouts took place in the evenings around five and five-thirty. (7 RR 55).

The trailer was secured by "a lock in the ball, a lock in the pin that comes back, a lock around the wheel, and then there are locks on the doors. One on the side door and two on the back door." (7 RR 56). It would not be possible for someone to just hook up the trailer and drive off real quick. (7 RR 56). To steal the trailer, it would take the person "some time." (7 RR 56). Further, if someone were at the company warehouse at 1:00 a.m., that would be suspicious. (7 RR 56).

Only two people had keys to use the trailer, and if an employee were trying to use the trailer, that person would have to have permission and the keys from either Monteilh or another employee named Colton Leonard. (7 RR 56-57). Monteilh did not know Appellant. (7 RR 57). Appellant was in possession of the company's trailer without consent. (7 RR 58).

**Nathan Kleiman** testified that he was an employee of Woodbolt Distribution on March 9, 2013 and was the one contacted about the trailer being stolen. (7 RR 61). Kleiman testified that a few employees had permission to use

32

the company's trailer. (7 RR 62). Appellant did have consent to use the company

trailer. (7 RR 62). Kleiman did not even know Appellant. (7 RR 62).

## SUMMARY OF THE STATE'S ARGUMENT

**No. 1**

In his first point of error, Appellant alleges the trial court committed error

when it allowed the State to amend the punishment enhancement paragraph of his

indictment after the jury was sworn in and over his objection. Here, the State

gave the defendant sufficient notice of the conviction used to enhance his

punishment range. Appellant improperly relies on the limitations imposed by

Tex. Code Crim. Proc. art. §28.10(b) which prohibits the State from amending

indictments after the jury has been sworn in. However, Article §28.10(b) was not

applicable. The State was therefore entitled to amend the enhancement paragraph

regardless of the jury being sworn in and over Appellant's objection. Thus, the

trial committed no error and Appellant's first point of error is meritless.

**No. 2**

In his second point of error, Appellant complains that the trial court erred

when it denied his Motion to Suppress. Specifically he alleges that the detaining

officer failed to corroborate the witnesses who reported Appellant's ongoing

criminal activity, and the lack of corroboration resulted in insufficient reasonable

suspicion to stop Appellant. Appellant complains that the trial court erred when it found that the detaining officer had sufficient reasonable suspicion.

However, the detaining officer did gather corroborating information before initiating the traffic stop. Officer Hauke observed the described witness and suspect vehicles traveling on the highway in the direction that the witnesses reported, and he also observed the suspect with the stolen property that the witnesses described.

Nevertheless assuming, *arguendo*, Hauke's corroboration was slight, Hauke's observations were still sufficient to satisfy reasonable suspicion because the witnesses tip was "inherently reliable." Prior to the traffic stop, the witnesses gave dispatch their identifying information and the witnesses' only connection to the offense is that of a concerned citizen reporting suspected criminal activity. The eye-witnesses provided thorough details, spoke to the 911 operator for a lengthy period of time, and provided continuous updates as they followed Appellant who was "driving crazy" down streets and the highway. As a result, the witnesses' information was considered inherently reliable.

Lastly, the witnesses provided 911 with extensive information to substantiate reasonable suspicion, and that information is included in the totality of the circumstances to justify Appellant's traffic stop. Because a 911 dispatch operator is considered a "cooperating officer," any information 911 dispatch

acquired from the witnesses is included in the totality of the circumstances to justify reasonable suspicion. As a result, the trial court did not err when it denied Appellant's motion to suppress evidence. Thus, Appellant's second point of error is without merit.

**No. 3**

In his final point of error, Appellant states that his judgment of conviction incorrectly reflects an enhanced conviction for a second-degree felony. Appellant's punishment range was properly enhanced, and he was appropriately sentenced within the applicable range of punishment. However, the degree of his offense was not enhanced. Therefore, Appellant's judgment should be reformed to show that the degree of his offense was a state-jail felony instead of a second-degree felony.

## STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR NO. 1

**The trial court committed no error when it permitted the State to amend Appellant's indictment after the jury was sworn in because the State amended an enhancement paragraph-not the language of the charged offense, and the State already provided sufficient notice of the prior conviction used for enhancement.**

In his first point of error, Appellant alleges that the trial court erred when it allowed the State to amend the enhancement paragraph of the indictment after the jury was sworn in. (Appellant's brief, p. 9). Appellant argues that the trial court violated Tex. Code Crim. Proc. art. 28.10(b) whereby the State is prohibited from

35

amending an indictment after the jury was sworn in, over the defendant's objection. First, the State amended an enhancement paragraph, which does not trigger Article 28.10(b). Therefore, Appellant's reliance on Article 28.10(b) is misplaced. Enhancement paragraphs can be amended on the day of trial in spite of the jury being sworn in and over the defendant's objection. To prove the trial court erred, Appellant was required to show that he was misled by the amendment; so the trial court did not err.  Second, when the court initially addressed the State's amendment, the jury had not been sworn in yet, and Appellant's trial counsel stated that they had no objection; therefore, he failed to preserve error.

Finally, the variance in the indictment was not fatal. Thus, even if the State did not amend the enhancement paragraph, the indictment would have been valid notwithstanding the variance in the conviction date. Assuming, *arguendo*, that the trial court erred by authorizing the State's amendment, such error was harmless. In conclusion, Appellant's first point of error is meritless.

### *Relevant facts- pretrial objection*

Appellant was indicted in the instant cause no. 13-02053-CRF-272 for theft of property $1,500-$20,000. The trial court swore the jury in around 4:04 p.m. on the day of trial. (6 RR 183-184). However, before the jury was sworn in, the State informed the court and the defense that they were going to amend the

enhancement paragraph to cure an error in one of the prior conviction dates for use during the punishment phase of trial. (6 RR 121-22). The amendment would change the prior conviction date from August 4 to August 14. (6 RR 121-22). On the record, Appellant's trial counsel stated that he had no objection to the State's amendment:

> THE COURT:     Is this one we're going to read prior convictions at the guilt/innocence or wait till punishment?
>
> MR. ROGERS:     Wait till punishment. **I actually talked to Mr. Flanigan about this. I'm going to amend one of the priors. It reads from the 4th day of August, I believe, and it should read on the 14th day. Dropped the one. I don't believe Shannon has any objection to that.**
>
> MR. FLANIGAN**:        We don't have objection to that, your Honor**. That's going to be a punishment issue anyway. May have to reset it for several days.
>
> THE COURT:      Not reading the punishment until we get to punishment?
>
> MR. ROGERS:     Correct.
>
> THE COURT:     The enhancements.
>
> MR. FLANIGAN:      I want to make sure we don't say anything about that. I'll be jumping up and screaming at that point.

(6 RR 121-22). (emphasis added).

Later, after the jury was sworn in but before the punishment phase began, the State attempted to proceed on the amendment that the parties had previously agreed to. (6 RR 211-12). At that point, Appellant's trial counsel changed his

position and objected to the State's amendment. (6 RR 211-14). Appellant erroneously believed that the State was procedurally barred from amending the enhancement paragraph once a jury had been sworn in:

> MR. FLANIGAN: Judge, **we didn't have an objection to the amending of the enhancement paragraph to correct a clerical error**. **Just want it on the record it's being done now after the jury has been sworn though.**
>
> THE COURT: What's being done, Mr. Prosecutor?
>
> MR. ROGERS: All right, Judge, I have amended. I have struck the number four in the context this is the 4th day of August 1978 and amended with the 14th day of August 1978.
>
> THE COURT: That's an enhancement paragraph number one or two?
>
> MR. ROGERS: That's in paragraph number one of the enhancement.
>
> THE COURT: All right. Any objection?
>
> MR. FLANIGAN: Your Honor, **at this point because the jury had already been sworn -- I'm sorry, I assumed that we were going to do this before the jury was sworn. I have to object to it at this point. I know, though, that the enhancement paragraphs will not come into play until punishment.** We've asked for your Honor to hear punishment at a later time.
>
> **THE COURT: It was brought to my attention before the jury was sworn this needed to be done. You indicated you had no objection.**
>
> **MR. FLANIGAN: That's correct. My concern is that now that the jury has been sworn I don't know that an indictment**

**can be amended. I have my concerns about that, that's why I'm raising that objection.**

MR. ROGERS:     Sorry to talk over you. Indictment as to enhancement paragraph is merely notice to proceeding. At that point you can do it by Brooks' notice.[2] That's not even in the indictment. And we can still go forward on that.

THE COURT:     Could you do that after – his big problem is the jury has already been sworn.

MR. ROGERS:     I believe that it's if the defense was put on notice, which they certainly have, as to what charges we're bringing to use on the enhancement, the only thing we changed is the conviction date.

THE COURT:     And when was the first time you discussed this with counsel?

MR. ROGERS:     I believe it was this morning.

MR. FLANIGAN: This morning.

MR. ROGERS:     Prior to jury selection.

MR. FLANIGAN: That's correct.

MR. ROGERS:     **Indicated had no objection to that.**

**MR. FLANIGAN:     Certainly Mr. Rogers has done -- I'm not complaining about any undue surprise or anything like that. I don't have a problem with that. My question is, I thought we were actually going to do the amendment before –**

---

[2]     *Brooks v. State*, 957 S.W.2d 30, 33 (Tex. Crim. App. 1997) (holding that: "a defendant is entitled to notice of prior convictions to be used for enhancement. But alleging an enhancement in the indictment is not the only reasonable method of conveying such notice…convictions used as enhancements must be pled in some form, but they need not be pled in the indictment.")

THE COURT: He tried to do it, as I recall, at three o'clock, but your client was not here. He was 12 minutes late.

MR. FLANIGAN: Right.

THE COURT: So I told him we had to wait until your client got there.

MR. FLANIGAN: Jury already been sworn at that point, I think.

MS. HEBERT: They had not.

MR. FLANIGAN: They had not, okay.

THE COURT: No, they were not sworn.

MR. FLANIGAN: I thought they were sworn before we left for lunch.

THE COURT: So it was due to your client's absence we could not do it in advance of the swearing of the jury. So I'm going to overrule your objection.

MR. FLANIGAN: Thank you.

(6 RR 211-14). (emphasis added).

### The enhancement paragraph was properly amended though it was done after the jury was sworn in and over Appellant's objection.

Despite Appellant's complaint, the State is not barred from amending an enhancement paragraph of an indictment on the sole basis that a jury was already sworn in and the defendant objected to the amendment. *See Barnes v. State*, no. 14-05-00144-CR, 2006 WL 2548186, at *3-4 (Tex. App.—Houston [14th Dist.] Sept. 5, 2006, pet. ref'd) (not designated for publication). If the State seeks to

40

correct a prior conviction date in an indictment's *enhancement paragraph*, Article 28.10(b) does not apply. *Id.* at *4 ("we find that Article 28.10 [3] does not apply to the alteration of the conviction date in the enhancement paragraph.") Therefore, Appellant's complaint is baseless.

In order for Appellant to successfully complain of an amendment to his enhancement paragraph, Appellant must prove that the amendment created prejudice. *See Bryant v. State*, 14-99-01373-CR, 2002 WL 27573, at *3 (Tex. App.—Houston [14th Dist.] Jan. 10, 2002, pet. ref'd) (not designated for publication.) Specifically, Appellant must prove that the amendment created undue surprise as a result of the mistake in his enhancement paragraph, and that Appellant could not discern which prior conviction the State intended to use against him. *Id.* Here, Appellant's trial counsel conceded that Appellant was not surprised. (6 RR 211-214).

### *Discussion-Appellant agreed to the amendment before the jury was sworn; Appellant suffered no harm*

Appellant complains that: "because [Appellant] objected to the State's motion to amend the indictment on the day of trial, it was error for the trial court to grant the amendment." (Appellant's brief, p. 9). However, prior to the jury

---

3       Tex. Code Crim. Proc. § art. 28.10(b) states:

      A matter of form or substance in an indictment or information may also be amended after the trial on the merits commences if the defendant does not object.

TEX. CODE CRIM. PROC. § art. 28.10 (b) states

being sworn in, Appellant's trial counsel stated that he had no objection to the amendment:

> MR. ROGERS: Wait till punishment. **I actually talked to Mr. Flanigan about this. I'm going to amend one of the priors. It reads from the 4th day of August, I believe, and it should read on the 14th day. Dropped the one. I don't believe Shannon has any objection to that.**
>
> MR. FLANIGAN**: We don't have objection to that, your Honor**. That's going to be a punishment issue anyway. May have to reset it for several days.

(6 RR 121-22). (emphasis added).

Appellant's trial counsel only changed his objection at the punishment phase of trial because he *erroneously* believed that, once the jury was sworn in, the State was procedurally barred from amending the indictment's enhancement paragraph [4]:

> MR. FLANIGAN: Your Honor, **at this point because the jury had already been sworn -- I'm sorry, I assumed that we were going to do this before the jury was sworn. I have to object to it at this point. I know, though, that the enhancement paragraphs will not come into play until punishment.** We've asked for your Honor to hear punishment at a later time.
>
> THE COURT: **It was brought to my attention before the jury was sworn this needed to be done. You indicated you had no objection.**

---

[4]     *See Barnes v. State*, 2006 WL 2548186, at *3-4 (Tex. Code Crim. Proc.§ art. 28.10(b) does not apply to the enhancement paragraphs within an indictment, so it serves as no bar that a jury was already sworn in and the defendant objected to the amendment.)

**MR. FLANIGAN:** That's correct. My concern is that now that the jury has been sworn I don't know that an indictment can be amended. I have my concerns about that, that's why I'm raising that objection.

(6 RR 212-13). (emphasis added).

Appellant's trial counsel conceded, however, that Appellant was not prejudiced by surprise:

THE COURT: And when was the first time you discussed this with counsel?

MR. ROGERS: I believe it was this morning.

MR. FLANIGAN: This morning.

MR. ROGERS: Prior to jury selection.

MR. FLANIGAN: That's correct.

MR. ROGERS: **Indicated had no objection to that.**

**MR. FLANIGAN:** Certainly Mr. Rogers has done -- I'm not complaining about any undue surprise or anything like that. I don't have a problem with that. My question is, I thought we were actually going to do the amendment before –

(6 RR 211-214). (emphasis added).

Consequently, Appellant cannot demonstrate that the trial court erred by allowing the State to amend his enhancement paragraph. First, Appellant did not preserve error: he failed to object to the amendment when he had the opportunity to do so. *Sample v. State*, 405 S.W.3d 295, 303 (Tex. App.—Fort Worth 2013, pet. ref'd.) ("[a]n appellant fails to preserve error by failing to object when he had

the opportunity…."). Instead, Appellant specifically stated on the record that he had no objection to the amendment. (6 RR 121-22).

Second, Appellant's trial counsel conceded that they had no complaint about being unduly surprised. (6 RR 212-214). Appellant's admission proved that the State's amendment did not create prejudice, so there was no error when the trial court authorized the amendment. (6 RR 212-14). *Barnes v. State*, 2006 WL 2548186, at *4 (amendments to enhancement paragraphs are only improper when "the discrepancy between the alleged date and the actual date of the prior conviction operated to deprive appellant of notice of the specific conviction the State intended to use for punishment enhancement.") Because Appellant (1) did not object to the amendment the first time he had the opportunity to do so, and (2) Appellant did not show that the amendment prejudiced him to his detriment, he failed to demonstrate that the amendment was improper or that the trial court erred. Thus, his first point of error is without merit.

### *Harmless Error-the variance in Appellant's date of conviction was not fatal*

Assuming, *arguendo*, that the trial court erred by permitting the State to amend the enhancement paragraph, Appellant must also show that a substantial right was affected in order for the appellate court to remand his case to the trial

court for a new punishment hearing. TEX. R. APP. P. 44.2(b)[5]. In order for a substantial right to be affected, the error must have a substantial and injurious effect of influence on the jury's verdict. *See King v. State*, 935 S.W.2d 266, 271 (Tex. Crim. App. 1997). Finally, in considering whether the error had a substantial and injurious effect or influenced the jury's verdict, the reviewing court should consider "the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002).

Where an indictment's enhancement paragraph contains an incorrect conviction date, and the defendant is afforded other, correct details of the prior conviction such as: the correct court, cause number, county, year, and offense, no harm results. *Barnes v. State*, 2006 WL 2548186, at *4. "The only purpose of an enhancement paragraph is to provide the accused with notice that the State will attempt to use a specific conviction for enhancement of punishment." *Bryant v. State*, 2002 WL 27573, at *3.

As a result, a variance in the enhancement paragraph is not fatal "so long as appellant was not prevented from identifying the conviction and preparing a defense thereto." *Id.* Thus, a minor clerical error in an enhancement paragraph will not render the indictment invalid. *Id.* ("The object of the doctrine of variance

---

[5]     Tex. R. App. P. 44.2(b) states in full: "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."

45

between allegations of an indictment is to avoid surprise, and for such variance to be material it must be such as to mislead the party to his prejudice.")

Accordingly, where the State proves up the correct court, cause number, county, year, and offense, the indictment will not be considered defective because the correct details provide the defendant with adequate notice of his prior conviction. *See Id.*; *Barnes v. State*, 2006 WL 2548186, at \*4.

Like in *Barnes* and *Bryant*, there was no harm. The indictment (CR 5) supplied Appellant with several additional facts that provided Appellant with sufficient notice of the prior convictions the State intended to use against him. Appellant's indictment contained the correct court, cause number, offense, county, and year of the prior convictions. *Id.* The State also entered the judgments and convictions to prove up those facts. (8 RR 10; *See* State's exhibits No. 25).

Thus, pursuant to *Motilla* and *Solomon*, even if this Court finds that the trial court erred by allowing the State to amend the enhancement paragraph, this Court should find that the error had no impact, and as a result, there was no harm. The record is clear that, in spite of the variance in the conviction date, Appellant still received adequate notice from the other facts in his indictment. Therefore, even if the enhancement paragraph was not amended, the indictment would have

been upheld as valid. Appellant's first point of error is without merit and should be overruled.

## STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR NO. 2

**The trial court committed no error when it denied Appellant's Motion to Suppress Evidence, where he alleged there was no corroboration of the witnesses tip. The record shows that: (1) law enforcement corroborated the witnesses observations and (2) the witnesses provided an inherently reliable tip.**

Appellant complains that the detaining officer lacked reasonable suspicion to conduct a traffic stop because he failed to corroborate the reporting witnesses' tip. However, the detaining officer did corroborate the witnesses' report: the detaining officer observed Appellant in the black dually truck, with the stolen cargo trailer, and at the location that the witnesses described. Additionally, the witness's information was inherently reliable thereby warranting the officer's belief that the traffic stop was justified.

### *Standard of Review*

A trial court's ruling on a motion to suppress is reviewed under an abuse-of-discretion standard. *Mount v. State*, 217 S.W.3d 716, 724 (Tex. Crim. App. 2007). As long as the trial court's ruling is within the "zone of reasonable disagreement," the ruling will not be overturned. *See Newton v. State*, 301 S.W.3d 315, 317 (Tex. App. —Waco, 2009, pet. ref'd). Appellate courts give almost total deference to both (1) the trial court's resolution of historical fact; and

(2) mixed questions of law and fact that turn on the weight or credibility of the evidence. The application of law to undisputed facts is reviewed *de novo*. *See Brother v. State*, 85 S.W.3d 377, 381 (Tex. App.—Fort Worth 2002, pet. ref'd). Under a *de novo* review, the evidence is viewed in the light most favorable to the trial court's ruling, and the reviewing court may not disturb supported findings of fact absent an abuse of discretion. *Id.*

**Findings of Fact and Conclusions of Law**

The trial court entered the following *Findings of Facts and Conclusions of Law* after a hearing on Appellant's Motion to Suppress Evidence held April 6, 2015:

> 1.     On April 6, 2015, the Defendant filed his Motion to Suppress Evidence. (CR 22). He complained that the stop of the defendant's vehicle was unlawful under both the Fourth Amendment and Tex. Const. art. I, §9 and prayed that all evidence obtained as a result of the stop be suppressed. (CR 23). The defendant did not analyze, argue, or provide authority to establish that his protection under Tex. Const. art. I, §9 exceeds or differs from the protection provided to him by the Fourth Amendment, however.
>
> 2.     On April 6, 2015 a hearing was held on the Defendant's Motion to Suppress Evidence. (6 RR 155-183). The defense argued that:
>
>> Your Honor, Officer Hauke was, no question, doing the best he could, but the fact is he stopped the person too early. He stopped the person before he was able to run the [vehicle and trailer license] tags. If he were able to run the tags, maybe he would have had a little bit more articulable facts to add to his suspicion that would have made this reasonable….

48

You know, obviously stops can be made on basis of reasonable suspicion, not necessarily probable cause. But that reasonable suspicion has to be articulable, and it's not. Even though he [Officer Hauke] has a suspicion of what kind of crime may have been committed by my client, he didn't have any easily verifiable information before he made that stop. He could have run that tag. He could have followed the vehicle for a longer period of time.

(6 RR 178-179).

3.    Admitted by the State during the hearing without objection were the following exhibits: State's Pretrial Exhibit 1: in car video from Officer's Hauke's patrol vehicle showing the stop of the defendant's vehicle and trailer; State's Pretrial Exhibit 2: Computer-aided dispatch "CAD" notes from 911 Dispatch concerning the stop; State's Pretrial Exhibit 3: audio of the 911 call from the reporting persons. (6 RR 157-159). State's Pretrial Exhibits 1 and 3 were played in court. (6 RR 164).

4.    State's Pretrial Exhibit 2 ("CAD" notes) indicated the following pertinent information was relayed by the reporting persons to 911 Dispatch, which was then relayed to Officer Hauke (6 RR 157):

12:49:31am    RP BELIEVES THESE PPL STOLE A TRAILER
12:49:42    THEIR DRIVING IS CRAZY, RP FOLLOWING
12:50:33    BLK DUALLY WITH TRAIILER [sic] ATTACHED TO BACK
12:54:00    RP IN MAROON DODGE CHARGER
12:58:04    RP HAS FLASHER ON
12:58:11    RIGHT BEHIND THEM
12:58:22    RP SAYS K9 RIGHT BEHIND
12:58:32    WHITE BOX TRAILOR [sic]
12:59:11    BARRON ROD[sic] EXIT. EXITING
01:06:02    RP IS GOING TO WAIT AT THE HARLEY DAVIDSON PARKING TLOT

49

5.    **Officer James Hauke** (Bryan Police Department) testified during the hearing that he was assigned to the Canine (K9) Unit that supports patrol. (6 RR 156).

6.    Officer Hauke stated that on March 9, 2013 at 12:40 a.m., 911 Dispatch broadcast a call of a reckless vehicle with a possible stolen trailer behind it. (6 RR 156, 160). The location in Bryan was in the area of Martin Luther King Street and the side streets of Dumas, Moss and Manning Way. (6 RR 159).

7.    911 Dispatch later advised that the reporting persons relayed that they were driving a maroon Dodge Charger and were following the suspect vehicle with the stolen trailer; the suspect vehicle was described as a black dually pickup with a trailer attached to the back. (6 RR 160-161). That information, and all additional information provided by the reporting persons, was relayed to Hauke through 911 Dispatch. (6 RR 166).

8.    The reporting persons told 911 Dispatch that the suspect vehicle was traveling on Highway 6 while leaving Bryan and entering the city limits of College Station. (6 RR 161).

9.    Officer Hauke entered Highway 6 southbound, passed the maroon Charger and pulled in behind the suspect vehicle. (6 RR 161). The Court finds that Officer Hauke corroborated the information provided by the reporting persons to 911 Dispatch. (6 RR 175).

10.    Officer Hauke attempted to read the paper license tag for the trailer. (6 RR 167). All he could make out was "D13." Because he was not able to determine the entire license tag for the trailer, Officer Hauke was not able to request that 911 Dispatch determine who the registered owner was before he stopped the suspect vehicle. Officer Hauke also could not see the license plate for the suspect vehicle. (6 RR 168).

11.    The suspect vehicle exited Highway 6 at the Barron Road exit in College Station. (6 RR 161, 172). Officer Hauke and the maroon Charger followed. Officer Hauke waited for a College Station Police unit to arrive as backup before initiating his stop of the suspect

50

vehicle. (6 RR 161).

12. Officer Hauke stated that he did not personally witness any reckless driving from the suspect vehicle. (6 RR 175).

13. The suspect vehicle turned on to Graham Road, and the defendant exited the suspect vehicle. (6 RR 162). Officer Hauke told the defendant to put his hands on the cab of the truck and then told the defendant to walk backwards toward Officer Hauke. Officer Hauke did not draw his weapon. (6 RR 173). A College Station officer then took the defendant and placed him in the back of a patrol car. (6 RR 162).

14. Officer Hauke requested that 911 Dispatch determine who the registered owner of the trailer was; the owner was Nathan Kleinman with Woodbolt Industries located in downtown Bryan. (6 RR 163).

15. The Court finds that the testimony of Officer James Hauke is credible and reliable.

16. The persons, who reported the theft of trailer, went to the Harley Davidson parking lot and waited to be interviewed. (6 RR 163). Officer Hauke went to that location, indentified them and obtained written statements from them. (6 RR 163-164).

17. The Court finds that the reporting persons placed themselves in a position to be held accountable for their report of a stolen trailer. Consequently, the Court finds that the information provided by the reporting persons is credible and reliable.

18. The **defendant** did not testify.

19. The Court finds that the following credible and reliable information, as detailed above, provided specific, articulable facts that, combined with rational inferences from those facts, would lead Officer Hauke reasonably to conclude that the defendant detained was currently engaged in or had been engaged in criminal activity, namely:

- On March 9, 2013 at 12:40 a.m., reporting persons witnessed

the suspect vehicle "driving crazy" and believed that the person driving the suspect vehicle had stolen the trailer attached.

- The reporting persons described the suspect vehicle towing the stolen trailer as a black dually pickup with a trailer attached to the back.
- The reporting persons identified themselves as driving a maroon Dodge Charger. They followed the suspect vehicle and provided its ongoing location to 911 Dispatch.
- Officer Hauke corroborated the reporting persons' information before stopping the suspect vehicle.

## **CONCLUSIONS OF LAW**

1.    The Fourth Amendment of the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

2.    As explained in *Derichsweiler v. State*, 348 S.W.3d 906 (Tex. Crim. App. 2011):

Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion. A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity. This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified. "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of

suspicion that attaches to particular non-criminal acts." Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." A 911 police dispatcher is ordinarily regarded as a "cooperating officer" for purposes of making this determination. Finally, information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable. In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot.

*Derichsweiler v. State*, 348 S.W.3d at 914-915 (footnotes omitted).

3. Based on the totality of the circumstances, the stop of defendant's vehicle was a temporary investigative detention that was reasonable under the Fourth Amendment. *See Derichsweiler v. State*, 348 S.W.3d at 915-917 (citizens report of strange, non-criminal behavior by defendant gave rise to a reasonable suspicion that he was about to engage in criminal activity); *Brother v. State*, 166 S.W.3d 255, 259 (Tex. Crim. App. 2005)(officers, who are apprised of detailed facts from citizen-eyewitnesses, are not required to observe suspects and wait until additional suspicious acts are committed); *Mount v. State*, 217 S.W.3d 716, 727-729 (Tex. App.—Houston [14th Dist.] 2007, no pet.)(officer had reasonable suspicion for investigatory detention of defendant who was driving vehicle similar to that described in radio dispatch as possibly stolen).

4. A defendant claiming relief under both the federal and state constitutions must "analyze, argue or provide authority to establish that his protection under the Texas Constitution exceeds or differs from that provided to him by the Federal Constitution." *Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993). Because the defendant in this case did not analyze, argue, or provide authority to establish that his protection under Tex. Const. art. I, §9 exceeds or differs from the protection provided to him by the Fourth Amendment, his state constitutional argument should not be addressed. *See Olivarez v. State*, 171 S.W.3d 283, 288 fn. 2 (Tex. App.—Houston [14th Dist.] 2005, no pet.)(court reviewed alleged violation under

53

Fourth Amendment but refused to address alleged violation under Tex. Const. art. I, §9).

## ORDER

IT IS THE ORDER OF THE COURT that the Defendant's Motion to Suppress Evidence is **DENIED**. (6 RR 183).

(*See* 9/23/15 Supp. CR, pages 1-7.)

**(1)** *Applicable law and discussion: The detaining officer did corroborate the witnesses tip.*

Appellant complains that his traffic stop was not justified because the officer failed to gather factual corroboration of a concerned citizen's 911 call reporting Appellant's criminal behavior. (Appellant's brief, p. 15-16.) He alleges that Officer Hauke "did nothing to corroborate that report before stopping [Appellant]." (Appellant's brief, p. 16). "The corroboration only occurred following the unlawful stop." (Appellant's brief, p. 16).

However, the record reflects that Officer Hauke did in fact corroborate the witnesses' tip before initiating the traffic stop. Hauke testified that he knew which direction to travel in order to locate the suspect because the witnesses were "feeding" dispatch information, and dispatch was updating law enforcement with information from the reporting witnesses. (6 RR 160-61, 166, 172, 175). Using the witnesses' vehicle description from dispatch, Hauke spotted the witness's Maroon Dodge Charger and the suspect's black dually pickup on Highway 6. (6 RR 160-161). Hauke began his pursuit when the witnesses reported that the

54

suspect was leaving the city of Bryan and entering the city of College Station. (6 RR 161). When Officer Hauke caught up to the suspect, Hauke saw that the suspect was already traveling "deep" in College Station. (6 RR 161, 172). Hauke also observed the witness's Maroon charger following behind the suspect's black dually truck with the described stolen cargo trailer, attached. (6 RR 160-61, 164, 175).

Officer Hauke's corroboration was analogous to the corroboration by the officer in *Derichsweiler v. State,* 348 S.W.3d 906 (Tex. Crim. App. 2011). In *Derichsweiler*, the Court of Criminal Appeals approved corroboration in a similar context. *Id.* at 912. The Court of Criminals Appeals stated that, "Officer Carraby was able to identify the [appellant's] vehicle from the specific description provided to him by the [witnesses] at the location they reported, thereby corroborating the tip he had received." *Id.* Because Officer Hauke similarly corroborated the reporting witnesses tip in the instant case, Appellant's complaint that Officer Hauke "did nothing to corroborate that report before stopping [Appellant]" (Appellant's brief, p. 16) is baseless. Appellant's first point of error should be overruled.

**(2) *The witness's tip was sufficiently reliable to justify the traffic stop.***

Law enforcement's traffic stop is lawful so long as the stop is justified by reasonable suspicion. *Id.* at 914 (whether or not a traffic stop was supported by

55

sufficient reasonable suspicion depends on whether the "totality of the circumstances" amounted to "an objectively justifiable basis for the detention.") The reasonable suspicion of a traffic stop is determined by the collective sum of all the cooperating officers' knowledge because "circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.* This includes any facts known by a 911 dispatch operator. *See Id.*

In *Derichsweiler*, the court stated that:

> [T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists. A 911 police dispatcher is ordinarily regarded as a 'cooperating officer' for purposes of making this determination.

*Id.* at 914-15.

The court also clarified that even when the dispatch operator does not pass on all of the witness's information; those facts are still part of the justification for the traffic stop:

> It matters not that the dispatcher did not pass all of these details along to the responding officers. In assessing reasonable suspicion, *vel non*, a reviewing court looks to the totality of objective information known collectively to the cooperating police officers, including the 911 dispatcher. The issue in this case boils down, therefore, simply to whether the totality of that reliable information provided specific, articulable facts that, combined with reasonable inferences to be derived from those facts, would lead to the reasonable conclusion that the appellant was committing, or soon would be engaged in, some type of criminal activity.

*Id.* at 915-16.

Some tips are considered inherently reliable and therefore justify a warrantless detention. *See Martinez v. State*, 261 S.W.3d 773, 776 (Tex. App.—Amarillo 2008, pet. ref'd). A tip is inherently reliable when the witness provides their personal identifying information and is willing to be held accountable for his tip, and whose only contact with the police results from his witnessing a criminal act. *Id.* If the tip qualifies as inherently reliable, that information warrants law enforcement's belief that a temporary detention is justified. *Id.* In *Derichsweiler*, the court ultimately held that:

> There is **no issue in this case with respect to reliability of the information supplied by the citizen-informants**-the Holdens. As the trial court found, they identified themselves to dispatch and remained answerable for their report after the fact. That report was based upon their own first-hand perceptions, many of which they continuously and contemporaneously narrated to the police via the 911 dispatcher. Nor do we hesitate to include what the Holdens [reporting persons] reported as part of the objective information that [the detaining officer] was entitled to rely upon in making the investigative stop. **Even if [the detaining officer was not personally aware of the detailed information the [reporting persons] had reported to substantiate their perception that the appellant's car was suspicion, the 911 dispatcher was**.

*Derichsweiler*, 348 S.W.3d at 915. (emphasis added).

A tip that is inherently reliable requires less corroboration. *Brother v. State*, 85 S.W.3d 377, 381 (Tex. App.—Fort Worth 2002), aff'd, 166 S.W.3d 255 (Tex. Crim. App. 2005). In *Brother*, the court of appeals stated:

Where the **reliability of the information is increased, less corroboration is necessary**. A **detailed description of the wrongdoing**, along with a **statement that the event was observed firsthand**, **entitles an informant's tip to greater weight**. A tip also deserves great weight if **the person puts herself in a position to be held accountable for her intervention**. Furthermore, **a person who is not connected with law enforcement or is not a paid informant is considered inherently trustworthy when she advises the police that she suspects criminal activity has occurred or is occurring**.

Appellant points out that [Officer] Williams did not observe him weaving, speeding, or driving erratically and asserts that [Officer] [Officer] Williams did not know any facts as a result of Spencer's 911 call that would have distinguished appellant from any other ordinary driver and thereby justified the stop. Appellant further contends that the 911 dispatcher did not give [Officer] Williams any information that would indicate that Spencer's information was reliable.

Even though [Officer] Williams did not personally observe appellant speeding or driving in an erratic manner, [Officer] Williams did have sufficient information to warrant the investigative detention. Spencer specifically explained to the 911 dispatcher why she believed appellant might be driving while intoxicated. She also described appellant's car and gave the dispatcher his driver's license plate number. Based on this information, the dispatcher contacted [Officer] Williams. The three stayed in constant contact until [Officer] Williams pulled appellant over, and the dispatcher updated [Officer] Williams with the information Spencer provided as the call progressed. [Officer] Williams also corroborated Spencer's information by verifying appellant's driver's license plate number before initiating the stop. Viewing this evidence in the light most favorable to the trial court's ruling, we hold that the trial court properly applied the law in concluding, based on the totality of the circumstances, that the stop of appellant's vehicle was valid

*Brother*, 85 S.W.3d at 381-82.

In Appellant's case, the witness's tip justified Officer Hauke's detention.

The eye-witnesses continuously updated the 911 dispatcher for nineteen-minutes

as they followed the suspect who was "driving crazy" down the streets and the highway. (6 RR 158; *See* 9 RR State's Pre-Trial Exhibit 3: *Audio of 911 call*); (6 RR 157; *See* 9 RR State's Pre-Trial Exhibit 2: *CAD Notes*.) The witness gave specific details describing the suspect's direction of travel, and landmarks and buildings the suspect was driving past. (6 RR 158; See 9 RR State's Pre-Trial Exhibit 3: *Audio of 911 call*); (6 RR 157; *See* 9 RR State's Pre-Trial Exhibit 2: *CAD Notes*.)

The eye-witness gave dispatch his identifying information including his cell phone and full name. (6 RR 158; See 9 RR State's Pre-Trial Exhibit 3: *Audio of 911 call*); (6 RR 157; *See* 9 RR State's Pre-Trial Exhibit 2: *CAD Notes*.) He also provided specific descriptions of his maroon Dodge Charger, the suspect's black Chevrolet dually, and the stolen white cargo trailer with the license plate number. (6 RR 158; *See* 9 RR State's Pre-Trial Exhibit 3: *Audio of 911 call*); (6 RR 157; *See* 9 RR State's Pre-Trial Exhibit 2: *CAD Notes*.)

When the 911 dispatcher requested the witnesses to turn on the flashers on their vehicle to signal the approaching officers, and the witness abided by the dispatchers request to provide updating information and stay at the scene. (6 RR 158; See 9 RR State's Pre-Trial Exhibit 3: *Audio of 911 call*); (6 RR 157; *See* 9 RR State's Pre-Trial Exhibit 2: *CAD Notes*.) The witness waited around after the stop so that officers could speak with them about the offense. (6 RR 163, 177).

The eye-witnesses tip was inherently reliable because the "witness provided their personal identifying information and [was] willing to be held accountable for his tip, and whose only contact with the police results from his witnessing a criminal act." *Martinez v. State*, 261 S.W.3d at 775.

Thus, Appellant's second point of error is without merit and should be overruled.

## STATE'S RESPONSE TO APPELLANT'S POINT OF ERROR NO. 3

**Appellant's judgment of conviction incorrectly reflects the degree of offense as a second-degree felony instead of a state-jail felony; the judgment should be reformed.**

Appellant states that he was convicted of the state-jail felony offense: theft $1,500-$20,000, but his Judgment of Conviction mistakenly reflects that his offense was enhanced to a second-degree felony. (Appellant's brief, p. 17-20; CR 35)[6]. Appellant does not dispute the propriety of the enhanced punishment range- he only complains of the clerical error in the judgment. (Appellant's brief, p. 17-20). The State agrees. The State properly enhanced Appellant's punishment range to the level of a second-degree felony, but the degree of Appellant's underlying offense remained a state-jail felony. (CR 5); Tex. Penal Code § 31.04(e)(4)(a); *See Ford v. State*, 334 S.W.3d 230, 234-35 (Tex. Crim. App. 2011)(holding that the habitual offender statute Tex. Penal Code §12.42 increases the range of

---

[6]    Specifically, the judgment contains the following erroneous notation, "Degree of Offense: State Jail Felony Enhanced to 2nd Degree Felony." (CR 35).

60

punishment applicable to the primary offense; it does not increase the severity level or grade of the primary offense.

Appellant was indicted for the state-jail felony offense of theft $1,500-$20,000. Tex. Penal Code §31.04(e)(4)(a); (CR 5). Pursuant to the Habitual Offender statute for state-jail felonies, Appellant's prior felony convictions qualified him for the heightened punishment range upon conviction. Tex. Penal Code §12.425(b); *See* State's Exhibits 25, 26, 28; (9 RR 62-68, 74-77, 87-92); (CR 15-16). The State gave Appellant proper notice of its intent to enhance Appellant's punishment to the range for second-degree felonies. (CR 15). Tex. Penal Code §12.425(b) authorized the State's punishment enhancement:

> If it is shown on the trial of a state jail felony…that the defendant has previously been finally convicted of two felonies other than a state jail felony… and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished for a felony of the second degree.

TEX. PENAL CODE. §12.425(b)

Accordingly, the trial court properly sentenced Appellant to 15 years under the enhanced second-degree felony range of punishment. (CR 35). However, the character of his offense did not change to a second-degree, as mistakenly reflected in the Judgment of Conviction. In alignment with the Court of Criminal Appeals decision in *Ford v. State*, *supra*, this Court addressed the same issue in *Romo v. State*, no. 10-14-00036-CR, 2014 WL 6609050, at *1 (Tex. App.—

61

Waco Nov. 20, 2014, no pet.). This Court in *Romo* explained that an enhancement allegation, "merely enhances the punishment range of the offense to that of a second-degree felony without changing the felony degree of the offense itself." *Id.* Thus, even though Appellant's punishment range was enhanced to that for a second-degree felony, the degree of his offense for theft $1,500-$20,000 never changed from a state-jail felony. As a result, the Judgment of Conviction indicating that Appellant's offense was a second-degree felony is incorrect and should be modified. (CR 35); *See Id*. Therefore, this court should reform Appellant's judgment of conviction to show that his offense was a state-jail felony.

This Court has the authority to modify Appellant's judgment in order to reflect the proper offense degree. *See Id.* (enhancement allegations only change the range of punishment, but do not change the degree of the offense; therefore the reviewing court can modify the judgment to reflect the appropriate offense degree and then affirm the modified judgment.) The record reflects that Appellant was punished within the proper, applicable punishment range based on his crime and criminal history, yet he was convicted of a state-jail felony. *See* TEX. PENAL CODE 31.03(e)(4)(A); (CR 35). Therefore, this Court should modify Appellant's Judgment of Conviction to show that the degree of his offense was a state-jail felony, rather than a second-degree felony.

**<u>PRAYER</u>**

Wherefore, premises considered, the State of Texas respectfully prays that the order of the trial court be in all things affirmed.

Respectfully submitted,

JARVIS PARSONS
DISTRICT ATTORNEY
BRAZOS COUNTY, TEXAS

Respectfully submitted,

/s/ *Maritza Sifuentez*

Maritza Sifuentez
Assistant District Attorney
Brazos County, Texas
300 East 26th Street, Suite 310
Bryan, Texas 77803
(979) 361-4320
misfuentez@brazoscountytx.gov
State Bar No. 24082124

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of the above and foregoing State's Brief was served electronically to Rick Wetzel, attorney for Appellant, at wetzel_law@1411west.com on this the 4th day of December, 2015.

/s/ *Maritza Sifuentez*

Maritza Sifuentez

63

CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4

I do hereby certify that the foregoing document has a word count of 14,703 based on the word count program in Word 2010.

/s/*Maritza Sifuentez*

Maritza Sifuentez
State Bar No. 24082124
msifuentez@brazoscountytx.gov